IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

DR. TALIB-KARIM MUHAMMAD,                  )
                                           )
        Plaintiff,                         )        NO. 88-2899-TUBRO
                                           )
REV. LEO GRAY, et al.,                     )
                                           )
        Plaintiffs,                        )        NO. 90-2093-TUBRO
                                           )
UNITED STATES OF AMERICA                   )
                                           )
        Plaintiff,                         )        NO. 91-2139-TUBRO
                                           )
VS.                                        )
                                           )
CITY OF MEMPHIS, TENNESSEE,                )
et al.,                                    )
                                           )
        Defendants.                        )

---

ORDER ON MOTIONS FOR PARTIAL SUMMARY JUDGMENT
AND CROSS-MOTION FOR SUMMARY JUDGMENT

---

In 1988, an individual by the name of Talib-Karim Muhammad brought a class action challenge[1] under Section 2 of the Voting Rights Act ("the Act"), 42 U.S.C. § 1973, certain other statutes, and the First, Thirteenth, Fourteenth and Fifteenth Amendments to the United States Constitution, challenging the City of Memphis' method of electing its mayor, council members and other city court officials. In 1990, the Rev. Leo Gray and others brought a similar suit against the same defendants and the Memphis Board of

---

[1] No class has ever been certified in this suit. Inasmuch as the relief sought by all plaintiffs effectively applies to the entire City, a class certification has not appeared to be necessary.

This document entered on docket sheet in compliance with Rule 58 and/or 79 (a) FRCP on 4-25-95

Education.[2]    In 1991, the United States filed suit and also challenged the city's election methods under § 2 of the Act, more particularly the at-large and numbered post devices for the election of six of the city council and two Board of Education members and the majority vote requirements in at-large elections of elected city officials and Board of Education members.  The three lawsuits have been consolidated because they raise similar issues of fact and law.  The Memphis Chapter of the NAACP has intervened in the consolidated suits as a plaintiff.

All plaintiffs seek the court's injunction against such devices and an order to require the defendants to devise election methods to remedy the § 2 violations.  The United States also seeks to have the City of Memphis designated for coverage pursuant to Section 3(c) of the Act for a period of fifteen years, thereby prohibiting the implementation of any election method, districting plan or annexation without preclearance from the Attorney General of the United States or this court.

The City of Memphis is a municipality in Tennessee created by a Private Act of the legislature of the State of Tennessee.  In 1966, pursuant to the Home Rule Amendment (Ordinance No. 1952), it adopted its current charter which provides that the city's governing body shall consist of a mayor and thirteen council members.  Of these thirteen, seven are elected from districts drawn by the council and six are elected by voters of the entire city, or

---

[2]    The issues concerning the Board of Education will be addressed by separate order.

2

at-large.  The charter also provides that an at-large candidate for a city council seat must run for a specified or numbered seat and city candidates in all elections must win a majority of the votes to be elected.

On July 26, 1991, this court held a hearing in these consolidated suits on the motion by the United States for preliminary relief concerning the 1991 Memphis municipal elections. The motion sought the preliminary injunction prohibiting the use of at-large city council elections, and a majority vote requirement for at-large elections.  In support of its motion, the United States submitted declarations by two expert witnesses, Dr. J. Morgan Kousser and Dr. James Loewen, and declarations by three lay witnesses who had run for at-large council seats, Minerva Johnican, Jerome Rubin and Myron Lowery.  In opposition to the motion for a preliminary injunction, the City of Memphis submitted declarations by three expert witnesses, Dr. Michael Gant, Dr. Williams Lyons and Dr. Michael Kirby, and four lay witnesses, newspaper reporter Jack Morris, attorney Jonathon Wax, Shelby County Election Commission employee Era Mae Switzler and former city council member Fred L. Davis.  On August 9, 1991, the court, after hearing oral argument on the motion, entered a preliminary injunction against the imposition of the majority vote requirement for the 1991 elections with regard to the offices of mayor, city court clerk, city judges, the six at-large council seats and the two at-large seats on the Board of Education.  The court denied all other preliminary relief sought by the United States.

Presently before the court are plaintiffs' motions for partial summary judgment and the four councilpersons' ("the Leffler defendants") cross-motion for summary judgment. The United States' and the other plaintiffs' motions seek a judgment that the election of city council members at-large to numbered posts and the application of a majority vote requirement to all city-wide offices violate § 2 of the Act. The Leffler defendants agree with plaintiffs that the majority vote requirement in city-wide elections needs to be permanently eliminated. They, however, deny that summary judgment is appropriate on the issue of whether the six at-large council seats violates the Act. The parties have provided the court with a substantial number of stipulations of fact relevant to the issues raised by the motion and cross-motion.

DISCUSSION

I.   Summary Judgment

When considering a motion for summary judgment, the court's function is not to weigh the evidence or judge its truth; rather, the court must determine whether there is an issue of fact for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). Summary judgment is "properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules . . . designed 'to secure the just, speedy and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1). The moving party is entitled to summary judgment where there is no genuine issue of material fact and the party is entitled to judgment as a matter of

4

law.  Fed. R. Civ. P. 56(c).  The substantive law governing the case will determine what issues of fact are material.  Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989).

The movant bears the initial burden of demonstrating the absence of any genuine issue of material fact, which may be accomplished by showing there is a lack of evidence to support the non-moving party's case.  Celotex, 477 U.S. at 325 (1986).  Once the moving party satisfies the initial burden, the burden then shifts to the non-moving party to set forth specific facts showing a genuine issue of triable fact.  Fed. R. Civ. P. 56(e).  To meet this burden, the non-movant must do more than present some evidence that there is a disputed issue.  Anderson, 477 U.S. at 249.  Rather, the non-movant must present sufficient admissible evidence upon which a fact-finder could return a finding sufficient to support a verdict favorable to the non-moving party.  Id.  Where a disputed issue of material fact is presented by countervailing admissible evidence, the non-movant's version of such fact is presumed correct.  Eastman Kodak Co. v. Image Technical Services, Inc., ____ U.S. ____, 112 S. Ct. 2072, 2077 (1992).

Where the parties have submitted cross-motions for summary judgment, the court addresses "each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration."  Taft Broadcasting Co. v. United States, 929 F.2d 240, 248 (6th Cir. 1991) (quoting Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1391 (Fed. Cir. 1987)).  Moreover, the fact that both parties

have submitted motions for summary judgment does not require the court to find that no issue of material fact exists. Id. (citing Begnaud v. White, 170 F.2d 323, 327 (6th Cir. 1948)).

## II.    The Voting Rights Act

Plaintiffs claim that Memphis' current method of electing city officials affords African-American Memphians "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice,"[3] in contravention of § 2 of the Act.  Section 2 of the Act as amended in 1982 provides:

> Denial or abridgement of right to vote on account of race or color through voting qualifications or prerequisites; establishment of violation
>
> (a)  No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title as provided in subsection (b).
>
> (b)  A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.  The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

---

[3]    42 U.S.C. § 1973-2(b).

6

42 U.S.C. § 1973. See also, S. Rep. No. 417, 97th Cong., 2d Sess. (1982), reprinted in 1982 U.S.C.C.A.N. 177 ("Senate Report").

Under § 2 as amended it is not necessary for plaintiffs to prove a discriminatory purpose or intent on the part of the defendant, City of Memphis. Thornburg v. Gingles, 478 U.S. 30, 35 (1986). Instead, it is sufficient if the plaintiffs prove that "in the particular situation, the practice operated to deny the minority plaintiff an equal opportunity to participate and to elect candidates of their [sic] choice." S. Rep. at 30, 1982 U.S.C.C.A.N. at 207. Congress' intent by enactment of the 1982 amendments was to have the courts take "a 'functional' view of the political process," and to engage in "a searching practical evaluation of the 'past and present.'" Gingles, 478 U.S. at 45.

Stipulation XIX of the parties filed with the court generally concedes the city's liability under § 2 by stating that the "City's present election system provides its black citizens with less opportunity than whites to participate in the political process." Such a sweeping conclusory statement of liability by itself might be insufficient to warrant summary judgment. However, the record contains a series of more specific factual stipulations that are relevant to this overall general concession of liability. A more thorough review of § 2's effect on at-large and majority vote electoral devices is necessary in the context of these more specific factual stipulations.

In Gingles, the Supreme Court of the United States recognized vote dilution as a special voting rights violation that did not

7

require any proof of discriminatory intent and set forth the criteria to be used to judge such a claim.

> The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives.  This Court has long recognized that multimember districts and at-large voting schemes may "operate to minimize or cancel out the voting strength of racial (minorities in) the voting population." . . .  The theoretical basis for this type of impairment is that where minority and majority voters consistently prefer different candidates, the majority, by virtue of its numerical superiority, will regularly defeat the choices of minority voters. . . .  Multimember districts and at-large election schemes, however, are not per se violative of minority voters' rights. . . . Minority voters who contend that the multimember form of districting violates § 2 must prove that the use of a multimember electoral structure operates to minimize or cancel out their ability to elect their preferred candidates. . . .

> While many or all of the factors listed in the Senate Report may be relevant to a claim of vote dilution through submergence in multimember districts, unless there is a conjunction of the following circumstances, the use of multimember districts generally will not impede the ability of minority voters to elect representatives of their choice.  Stated succinctly, a bloc voting majority must usually be able to defeat candidates supported by a politically cohesive, geographically insular minority group. . . .  These circumstances are necessary preconditions for multimember districts to operate to impair minority voters' ability to elect representatives of their choice for the following reasons.  First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district.  If it is not, as would be the case in a substantially integrated district, the multimember form of the district cannot be responsible for minority voters' inability to elect its candidates. . . .  Second, the minority group must be able to show that it is politically cohesive.  If the minority group is not politically cohesive, it cannot be said that the selection of a multimember electoral structure thwarts distinctive minority group interests. . . .  Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it . . .

8

usually to defeat the minority's preferred candidate. Gingles, 478 U.S. at 47-51. (footnotes and citations omitted; emphasis in original).

The Fourth Circuit in McGhee v. Granville County, North Carolina, 860 F.2d 110 (4th Cir. 1988), provides an excellent explanation of the principles underlying a dilution claim:

> The basic concept, broadly stated, is that racial minorities may not have their group voting power impermissibly "diluted" by multimember districting or at-large electoral processes which "submerge" the minority voting group in a voting constituency in which the voting power of a racially "bloc-voting" white majority always insures defeat for the candidates of the minority group's choice.

Id. at 116.

Nonetheless, at-large electoral structures are not considered per se violative of § 2. Gingles, 478 U.S. at 46. There are sound political philosophies and theories to support the retention of at-large election methods.

To set forth a vote dilution claim under § 2 of the Act, a plaintiff must begin by demonstrating the presence of the preconditions delineated by the Supreme Court in Gingles:

1.   The plaintiffs must demonstrate that the protected group is sufficiently large and geographically compact[4] that it could constitute an effective majority in a single-member district.

2.   The plaintiffs must show that the protected group is

_____

[4]   When an at-large election system is challenged, the "geographically compact" factor assures that a single-member district remedy will be sufficient to prevent diminution of minority voting strength caused by the use of at-large elections.

politically cohesive.[5]

3.   The plaintiffs must show that the majority votes sufficiently as a bloc to enable it usually to defeat the protected group's preferred candidate.[6]   Gingles, 478 U.S. at 50.

The parties have essentially stipulated to the presence of the Gingles preconditions.   Summary Stipulation VII provides that "black citizens of Memphis are sufficiently numerous and geographically compact to form effective voting majorities in single-member districts,"[7] thereby satisfying the first Gingles factor.   The second Gingles precondition, political cohesiveness of the protected group, is also satisfied by the relevant stipulations and is undisputed.   Stipulation 35 provides that "more than ninety-five percent of black voters supported mayoral candidates in six of the seven black-white mayoral elections between 1979 and 1991."   In city council races an average of 63.6 percent of black voters supported the black candidates.   Black and white voters preferred different candidates eighty-eight percent of the time in forty outcome-decisive elections for mayor and at-large city council seats between 1967 and 1987.   Stipulated Facts, number 40.

---

[5]   Cohesiveness of the minority voters is a precondition because, without cohesiveness, minority voters' group interests are not thwarted by a multimember electoral structure, such as at-large voting.

[6]   Unless the white majority votes as a bloc and thus is usually able to defeat minority candidates, then submergence in a white multimember electoral district does not impede the minority's ability to elect their chosen representatives.

[7]   Stipulations 10, 17, 24 and 272-273 set out the specific factual assertions on which Summary Stipulation VII is based.

With respect to the third precondition, numerous stipulations convincingly demonstrate that whites in Memphis vote sufficiently as a bloc which enables them to usually defeat the African-American community's preferred candidate.[8]    Among other facts the stipulations reflect that, prior to 1991, black candidates ran for mayor in four out of the six mayoral elections and lost each time. Stipulated Facts, number 14.  Only three black candidates have been elected to city council at-large seats out of forty-two elections between 1967 and 1991.  Stipulated Facts, number 18.  More than seventy percent of white voters supported white candidates in all but one election.  In that one election, sixty-six percent of the white voters voted for the white candidate.  Stipulated Facts, number 39.

Using ecological regression analysis, two of the city's experts, Drs. Gant and Lyons, have reported racially polarized voting in eighty-seven percent of the outcome-decisive elections for mayor and at-large city council seats between 1967 and 1991. Stipulated Facts, number 42.  Drs. Gant and Lyons also reported that voting was racially polarized in ninety-five percent of all runoffs for mayor and at-large city council seats between 1967 and 1987.  Stipulated Facts, number 43.

Establishing the three _Gingles_ preconditions operates as a threshold requirement for a § 2 claim, but once those preconditions

---

[8]    _See_ Summary Stipulations III, IV and Stipulations 14, 18, 19, 22, 23 25, 36, 38, 40, 42, 43, 44 and 46 which specifically support the fact that bloc voting by white Memphians has prevented black candidates from achieving sufficient electoral success.

are satisfied the court must proceed to an evaluation of the "totality of the circumstances" arising in the case. <u>Rural West Tennessee African American Affairs Council, Inc. v. McWherter</u>, ___ F. Supp. ___, 1995 WL 100588, (W.D. Tenn. Feb. 22, 1995); <u>McNeil v. Springfield Park District</u>, 851 F.2d 937, 942 (7th Cir. 1988) (successful demonstration of <u>Gingles</u> factors necessary for plaintiff to succeed beyond summary judgment stage). The plaintiffs can succeed in their § 2 claim only if the <u>Gingles</u> factors are met and the totality of the circumstances[9] are found to support a finding of vote dilution.

The Senate Judiciary Committee lists several factors in the legislative history to the 1982 Amendments to the Act to assist the courts in weighing the totality of the circumstances in vote dilution cases. The factors for consideration listed in the Senate Report are:

---

[9] The totality of the circumstances requirement, built into a voting dilution claim, obviously involves complicated factual scrutiny. As a result, some have argued that such complexity may render summary judgment inappropriate in § 2 cases. <u>See e.g.</u>, <u>McNeil v. Springfield Park District</u>, 851 F.2d 937, 940 (7th Cir. 1988) ("Appellants' strongest argument is that summary judgment is inappropriate in § 2 cases, which generally call for substantial and complex factual determinations."). However, many courts have found summary judgment nevertheless proper in § 2 cases where the circumstances merit such a procedural result. <u>Baird v. Consolidated City of Indianapolis</u>, 976 F.3d 357 (7th Cir. 1992); <u>DeBaca v. County of San Diego</u>, 794 F. Supp. 990, 1000-1001 (S.D. Cal. 1992); <u>Burton v. Sheheen</u>, 793 F. Supp. 1329, 1350 n.37 (D.S.C. 1992) ("[T]he Voting Rights Act, despite being a 'crucially important piece of national legislation,' remains 'subject to the same considerations of administration as other similar statutes.'" (citation omitted); <u>West v. Clinton</u>, 786 F. Supp. 803 (W.D. Ark. 1992). Here, the stipulations submitted by the parties resolve many of the factual issues and render disposition by summary judgment a proper method for dealing with this case.

12

1.   The extent of any history of official discrimination in the state or political subdivision that touched the right of members of the minority group to register, vote, or otherwise to participate in the political process;

2.   the extent to which voting in the elections of the state or political subdivision is racially polarized;

3.   the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4.   if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5.   the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6.   whether political campaigns have been characterized by overt or subtle racial appeals;

7.   the extent to which members of the minority group have been elected to public office in the jurisdiction.

Additional factors which in some cases have had probative value as part of plaintiffs' evidence to establish a violation are:

Whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.

Whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting or standard, practice or procedure is tenuous.

Senate Report at 28-29.

The majority but certainly not all of the senate factors are present in this case and have been stipulated to by the parties.

13

The court will address each factor individually and set forth the various stipulations that directly pertain to the factor being discussed.

The first factor suggests that courts consider the extent to which states have historically discriminated against the minority group in the voting arena. Summary Stipulation IX provides that "[i]n the late 1800's, the State of Tennessee enacted laws that affected the right of black citizens in the state to register, to vote and to otherwise participate in the democratic process." That stipulation further cites to two Tennessee cases that have also found evidence of historical discrimination in voting by the state. See Buchanan v. City of Jackson, 683 F. Supp 1515 (W.D. Tenn 1988); Brown v. Board of Commissioners of Chattanooga, 722 F. Supp 380, 385-86 (E.D. Tenn 1989). The following stipulations provide additional proof of the presence of the first senate factor in Memphis:

> Stipulation 48: The 1834 Tennessee Constitution prohibited slaves and free blacks from voting.
>
> Stipulation 50: The 1870 Tennessee Constitution authorized the legislature to prescribe a poll tax as a qualification attached to the right of suffrage.
>
> Stipulation 51: In 1870, The Tennessee legislature enacted a law, 1870 Tenn. Acts 10, which established a poll tax as a prerequisite "to vote for members of the General Assembly and other civil officers for the county or district in which he may reside."
>
> Stipulation 53: In 1889 the Tennessee legislature enacted a law applicable "to all elections hereafter to be held on the first Tuesday of November," 1889 Tenn. Acts 218, that required state and local election ballots to be placed in a ballot box that was separate from the federal election ballot box.

14

Stipulation 54:   1889 Tenn. Acts 218 required voter registration applicants "not personally known to the Registrars" to provide, among other things, the names of the applicant's landlord and employer.

Stipulation 55:   In 1889 the Tennessee legislature enacted a law, 1889 Tenn. Acts 188, applicable to Tennessee counties with populations over 70,000 and Tennessee towns with populations over 9,000 as of the 1880 federal census, that provided for secret ballots which required voters to be able to read the names on the ballot rather than merely ask for ballots by party name. This statute applied to Shelby County.

Stipulation 56:   In 1890, the Tennessee legislature enacted a law, applicable to counties having a population of over 70,000 and towns having a population of over 9,000 inhabitants as of the 1880 census, 1890 Tenn. Acts 25, requiring persons registering to vote to give the name of their landlord and employer.   This statute applied to Shelby County.

Stipulation 57:   In 1890, the Tennessee legislature established a poll tax as a prerequisite to vote.

Stipulation 58:   In the late 1860s, black Tennesseans obtained the right to vote and the right to hold public office.   During the 1880s twelve black legislators, including nine from western Tennessee, served in the General Assembly.   In 1889 and 1890, however, the state enacted the following: (1) a law requiring persons to register twenty days before each election; (2) a law providing for separate state and federal ballot boxes; and (3) a law providing for a secret ballot, which in the absence of provision for assistance acted as a literary test; and (4) a law establishing a poll tax.   Pursuant to legislative authority granted by the 1870 Tennessee Constitution, the Tennessee General Assembly had previously enacted 1870 Tenn. Acts 10, which established a poll tax as a prerequisite for a voter "to vote for members of the General Assembly and other civil officers for the county or district in which he may reside." (citations omitted).

Stipulation 146:   On February 19, 1959, the Memphis Press-Scimitar, in an article entitled "How An Anti-Single Shot Bill Would Work in Shelby - It Has Racial Purpose," described the intent and effect of pending legislation to require candidates for the eight at-large Shelby County state house seats to run for specific district numbers, although each district would encompass the entire county:

> The lower house bill is frankly designed to keep minority groups -- such as negroes or labor -- from electing a man to the House.
>
> A Shelby delegation spokesman in Nashville admitted this.
>
> Negro leaders are aware of this threat to negroes being elected, and say it will at least postpone the day when a negro legislator or city commissioner is elected.
>
> As it is now, a negro candidate, running along with a number of other candidates, could get in the top eight if enough negroes voted only for one candidate. The new law would make it pointless for negroes, labor or any other minority group to concentrate on one candidate.

Stipulation 158: On June 17, 1959, the Memphis Commercial Appeal reported that:

> Gov. Buford Ellington will be asked [by Commissioner Henry Loeb] whether he will consider a special session of the Tennessee Legislature to pass a private act applicable to Memphis.
>
> The desired act would require a runoff between the two top candidates seeking City Commission posts in the Aug. 20 municipal election where no one receives a plurality.
>
> It would be aimed primarily at Negro candidates who enter contests where there is a large number of candidates and could win by obtaining the highest individual vote, or a simple majority [sic].
>
> Attention was directed to a runoff when Russell Sugarmon Jr., Negro attorney, announced as a candidate for public works commissioner. There are six white candidates in the same contest.

Stipulation 161: On June 13, 1959, the Memphis Commercial Appeal reported that the:

> Primary purpose of such an unofficial competition [the voluntary runoff] would be to remove the possibility of a Negro candidate winning the race as the result of a Negro bloc vote, over six or more white candidates.

The second senate factor requires this court to consider the

16

extent to which voting in Memphis is racially polarized. The parties have also, to a great extent, stipulated to this factor. Summary Stipulation II confirms that "[t]here has been a pattern of racially polarized voting in at-large city elections between 1967 and 1991 in Memphis." That stipulation further provides that "[i]n those at-large city elections in which there was at least one black candidate, black voters have been politically cohesive and black voters usually have had different voting preferences than white voters." The following additional stipulations further evidence that racially polarized voting exists in Memphis:

> Summary Stipulation III: The black-preferred candidates for at-large seats usually have been defeated.

> Summary Stipulation IV: Runoff elections for mayor and for city council between 1967 and 1987 have shown a greater degree of racial polarization and more frequent minority vote dilution than general municipal elections during that time period.

> Stipulation 14: Between 1967 and 1987 black candidates ran for mayor in four of the six regular election cycles and in the one special election for mayor; white candidates were elected mayor in each of those elections.

> Stipulation 18: Among the forty-two at-large seats on the city council elected between 1967 and 1991, only three were won by black candidates.

> Stipulation 23: Despite repeated candidacies, between 1967 and 1991 black candidates have won only six contested elections for at-large city offices in Memphis. Four of these at-large victories occurred in 1991, during the pendency of this litigation. Two of the black at-large victories in 1991 were by plurality vote, which in the absence of this court's preliminary injunction would have led to black-white runoff elections.

> Stipulation 35: Ninety percent or more of white voters supported white candidates in the seven black-white mayoral elections between 1979 and 1991. More than ninety-five percent of black voters supported black mayoral candidates in six of these seven elections.

Stipulation 36:  Drs. Gant and Lyons[10] concluded that in the seven outcome-decisive mayoral elections they analyzed between 1967 and 1987 (1967 runoff, 1971 run-off, 1975 run-off, 1979 run-off, 1983 primary, 1987 primary and 1991 primary) voting was racially polarized, and they concluded that every mayoral contest except the 1991 election exhibited minority vote dilution.

Stipulation 39:  Dr. Loewen's analysis indicated that in the black-white city council contests (including three runoffs) an average of 63.6 percent of black voters supported the black candidates, and that more than 70 percent of white voters supported white candidates in each election except for the 1983 runoff victory by Minerva Johnican, when 66 percent of white voters supported her white opponent.

Stipulation 40:  Drs. Gant and Lyons reported that in the forty outcome-decisive elections (runoffs and primaries that did not lead to runoffs) for mayor and at-large city council seats between 1967 and 1987, black voters and white voters preferred different candidates in thirty-five elections -- 88 percent of the time.  In these forty contests, which include both white-white and black-white contests, Drs. Gant and Lyons concluded that there was minority vote dilution in 27 of the 40 contests -- 68 percent of the time.  Drs. Gant and Lyons concluded that mayoral and councilmanic elections between 1967 and 1987 were racially polarized and diluted the voting strength of the black minority.

Stipulation 41:  Drs. Gant and Lyons reported that black voters and white voters preferred different candidates in six of the seven contests for mayor and at-large city council seats in 1991, all of which were black-white contests.  In two of these seven contests Drs. Gant and Lyons concluded that there was minority vote dilution.

Stipulation 42:  Drs. Gant and Lyons reported that among the 47 outcome-decisive elections for mayor and city council between 1967 and 1991, voting was racially polarized in 41 (87 percent) and there was minority vote dilution in 29 (62 percent).

Stipulation 43:  Drs. Gant and Lyons reported that voting was polarized in 95 percent of all runoffs for mayor and at-large city council seats between 1967 and 1987, and

---

[10] Drs. Gant and Lyons are experts that were hired by the City of Memphis, a defendant in this suit.  Their task was to analyze the city elections since 1967.

18

that there was minority vote dilution in 84 percent of all runoffs for mayor and at-large city council seats between 1967 and 1987.

Stipulation 46:   Dr. Loewen analyzed 32 interracial contests and seven runoffs between 1979 and 1991, in which the white candidates prevailed in 25.  Not once did a majority of white voters favor the black candidate(s).

The third factor urges this court to take account of unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices in Memphis that may enhance the opportunity for discrimination against the African-American community.  The following stipulations indicate that some such practices have been used to the disadvantage of minorities in Memphis.

Summary Stipulation V:   The absence of a runoff requirement affected the outcome of several 1991 elections in which black candidates were elected at-large.

Summary Stipulation XV:  Since 1959, candidates running for at-large positions on the Memphis City Council (formerly city commission) have been required to run for designated posts.  Designated or numbered posts have the affect of preventing single-shot voting.

Summary Stipulation XVI:   From 1967 through 1990, candidates running for any city office were subject to a majority vote requirement.

Stipulation 5:  Memphis city officials are elected in nonpartisan elections for concurrent, four-year terms. A majority vote requirement was enforced for all city offices between 1967 and 1990: if no candidate received a majority of the votes cast in the October general election, the two leading vote-getters met in a November runoff election.  The current city charter provides that seven members of the Memphis City Council shall be elected from single-member districts and six members shall be elected at-large to numbered posts.

Stipulation 6:   There is no state constitutional or legislative provision that requires either numbered posts or that a candidate receive a majority of the votes cast

19

in municipal elections.

Stipulation 147:    In 1959, the Tennessee legislature enacted 1959 Tenn. Priv. Acts 199, which required candidates for city commission to run for specific posts.

Stipulation 230:  In August 1966, the voters in the City of Memphis approved a charter amendment, Ordinance No. 1794 (1966), that imposed a majority vote requirement for municipal elections, including all elections at large.

The fourth factor addresses whether or not there is a candidate slating process, and if so if black candidates in Memphis have been denied access to that process.  The record does not contain any stipulations relating to this factor.

The fifth factor requires the court to consider whether black citizens of Memphis bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process. Summary Stipulation XIII provides that "[t]here are marked disparities between the average educational, employment, income level and living conditions of black persons and white persons residing in the City of Memphis."  Summary Stipulation XIV further states that "[b]lack registered voters generally participate in the political process in Memphis at a lower rate than do white registered voters."  While many of these stipulations clearly evidence a substantial difference in the standard of living in Memphis between whites as a whole and blacks as a whole, there is little if any evidence to show that these differences are caused by past discrimination.

The following stipulations also provide relevant information regarding this factor:

Summary Stipulation X:  In addition to restrictions on the franchise, the State of Tennessee fostered and imposed racial segregation of facilities, including public and private schools.

Summary Stipulation XI:  State segregation laws were applied locally in Memphis and sometimes supplemented by local ordinances through the late 1950's and early 1960s.

Stipulation 47:  This stipulation contains socioeconomic statistics from the 1980 Census and highlights the income and educational disparities between white and black citizens of Memphis.  For example, the white median family income in 1979 was $21,592 while the black family median income was $10,563 (approximately half of the white income.)  The percentage of black families living below the poverty line was 32.9% while only 5.2% of white families were living below poverty.  In the education context, only 45.4% of black Memphians had completed four years of high school in 1980, while 75.4% of whites living in Memphis had completed four years of high school.  Other examples are that 32.5% of blacks compared to 7.4% of whites did not have a vehicle available to their household and 12.2% of blacks compared to 3.6% of whites were living in households without a single telephone.

Stipulation 85:  The City of Memphis currently operates under a federal consent agreement as a result of Hale v. H.U.D., et al., No. C-73-410 (W.D. Tenn. 1983), a housing discrimination case.

Stipulation 86:  The City of Memphis currently operates under a federal consent agreement as a result of United States v. City of Memphis, No. 74-286 (W.D. Tenn. Nov. 24, 1974), an employment discrimination case.  See Firefighters Local Union No. 1784 v. Stotts, 467 U.S. 561 (1984).

The sixth factor examines whether political campaigns in Memphis have been characterized by overt or subtle racial appeals. The record does not contain any information or stipulations documenting overt or subtle racial appeals in campaigns for Memphis city government positions.

The seventh and final senate factor addresses the extent to which African-Americans in Memphis have been elected to public

21

office.  The following stipulations indicate that African-American citizens of Memphis have not achieved significant electoral success in city elections.

> Stipulation 14:  Between 1967 and 1987 black candidates ran for mayor in four of the six regular election cycles and in the one special election for mayor; white candidates were elected mayor in each of those elections.

> Stipulation 18:  Among the forty-two at-large seats on the city council elected between 1967 and 1991, only three were won by black candidates.

> Stipulation 20:  The number of city court judges has varied between 1967 and 1991, but black candidates won contested elections for city court judge only twice in that time period.

> Stipulation 22:  No black candidate has been elected to the position of Memphis City Court Clerk.

> Stipulation 23:  Despite repeated candidacies, between 1967 and 1991 candidates have won only six contested elections for at-large city offices in Memphis.  Four of these at-large victories occurred in 1991, during the pendency of this litigation.  Two of the black at-large victories in 1991 were by plurality vote, which in the absence of this court's preliminary injunction would have led to black-white runoff elections.

> Stipulation 25:  Only one black person has been elected to the school board at-large in this century.

> Stipulation 38:  In the 1982 special primary and runoff elections, J.O. Patterson, a black candidate, received 40.7 percent plurality of the vote.  Patterson lost in a runoff to Richard Hackett, a white candidate, who had received 29.8 percent of the vote in the primary.  But for the majority vote requirement Memphis would have had a black mayor in 1982.

> Stipulation 46:  Dr. Loewen analyzed thirty-two interracial contests and seven runoffs between 1979 and 1991, in which the white candidates prevailed in twenty-five.  Not once did a majority of white voters favor the black candidate(s).

The 1982 Amendments to the Act also list two additional factors which under certain circumstances can be probative of

22

whether or not a § 2 violation has occurred. The first additional factor considers whether elected officials are unresponsive to the particularized needs of black citizens of Memphis. There is nothing in the stipulations before the court that demonstrates such unresponsiveness. The other factor is whether the policy underlying the city's use of at-large voting and runoffs is tenuous. The following stipulations relate to this issue of "tenuousness":

> Summary Stipulation XVII: There is no state constitutional or legislative provision that either requires or prohibits numbered posts or the imposition of a majority vote requirement for candidates in municipal elections.

> Stipulation 285: There is no state constitutional or legislative provision that either requires or prohibits at-large elections for members of municipal governing bodies.

The question before the court on the cross-motions for summary judgment is whether, under the totality of the circumstances, a genuine dispute of material fact exists as to whether Memphis' charter provisions for the election of its officers fail to provide black citizens an equal opportunity with its white citizens to participate in the political process and to elect representatives of their choice. If not, and that lack of equal opportunity is established as a matter of law, the city's liability under § 2 is established. The court finds that there is no genuine dispute of material fact reflected in the record regarding the city's liability under § 2 of the Act. See Summary Stipulation XIX. Accordingly, the court will enter a finding of minority vote dilution against the city, invalidating Memphis' current electoral

23

system.

By order dated August 9, 1991, this court preliminarily enjoined the City of Memphis from implementing the majority vote requirement in the 1991 municipal elections. All defendants agree that the majority vote provision in at-large elections violates the Act. There is sufficient undisputed evidence in the record to support a finding that at-large run-offs under the current charter have and do cause minority vote dilution in the City of Memphis. Further, during the July 26, 1991 hearing this court agreed with the plaintiffs that the proof reflected that at-large run-off provisions were enacted in Memphis primarily for a racially discriminatory purpose. The evidence in the record is insufficient as a matter of law to support a judgment upholding the at-large majority vote requirement in the face of § 2 of the Act.

Plaintiffs also contend that the city's use of at-large positions for six council seats in and of itself violates § 2 of the Act and should therefore be eliminated by court order. Four city council members[11] disagree contending that the results of the 1991 municipal city council elections, which were held without run-offs for the at-large positions and which resulted in several black candidates being elected at-large, offer material evidence that at-large voting does not impede black electoral success or dilute the

_____

[11] Some question exists regarding whether or not the four city councilpersons that filed a cross-motion for summary judgment have standing to file such a motion. Those city council members were sued in their official capacity, therefore, it is unclear whether or not they are authorized to oppose the decisions of the city council as a whole. This issue has only been briefly discussed in the memoranda of the parties.

24

black vote.  These four city council members argue that the 1991 election results establish that African-American citizens of Memphis can elect "representatives of their choice" in a system that retains some at-large voting while eliminating the majority vote requirement.

With both run-offs and at-large seats in place it is difficult to discern whether only one of those two provisions caused the dilution, or whether both provisions contributed to the electoral imbalance.  However, the Gant & Lyons June 1991 Report (defendants' experts) does establish without dispute that of those elections conducted between 1967 and 1987 without run-offs, sixty percent (six out of ten) resulted in minority vote dilution.  Gant & Lyons, p. 9.  Further, Stipulation 41 provides that there was minority vote dilution in two contested seats that were elected at-large in the 1991 elections, even absent the run-offs.  Finally, Stipulation 18 states that among the forty-two at-large seats on the city council elected between 1967 and 1991, only three were won by black candidates.

A strong pattern of minority vote dilution in the election of candidates at-large has been established by the stipulated facts. The atypical results of the 1991 city elections do not compel a finding that the at-large provision for six of thirteen seats on the city council is free of dilutive effect.  In that election four blacks won in eleven city-wide races, but two won only by a plurality and the evidence is undisputed that they would have lost had they faced a run-off.

On the other hand, the 1991 elections demonstrated that African-American candidates could in some election contests achieve electoral victories, even at-large, once the majority vote requirement was eliminated. However, the fact that African-Americans have achieved some success at electing candidates of their choice does not necessarily mean that the current electoral system complies with § 2. See Gingles, 478 U.S. at 75 ("the language of § 2 and its legislative history plainly demonstrate that proof that some minority candidates have been elected does not foreclose a § 2 claim."); Lulac v. Clements, 986 F.2d 728, 751 (1993) ("Congress cautioned against giving too much weight to the isolated incidence of minority candidate success.").

There is substantial undisputed evidence in this case of minority vote dilution, even in those elections where run-offs were not utilized. The current charter provision which provides for six of thirteen city councilpersons to be elected at-large operates to assure a substantial white majority on the city council as long as whites are in a majority and vote as a bloc. In light of this undisputed evidence, the court concludes as a matter of law only that the at-large charter provision which provides for six at-large seats out of the thirteen seats, as drawn is itself violative of § 2 of the Act.

Based on the undisputed facts and the entire record in these proceedings, the court concludes that the City of Memphis' current electoral system of six at-large council seats and the majority vote for at-large elections violates § 2 of the Act because it does

26

not afford black citizens of Memphis the same opportunity as white citizens to elect representatives of their choice.

The preferred course in remedying electoral systems which the court finds in violation of § 2 is to afford the parties, and particularly the elected legislators of the political division involved, the opportunity to suggest a change in the current electoral system which will eradicate the minority vote dilution.

The parties therefore shall have thirty (30) days following entry of this order within which to propose and submit an injunction decree that will remedy the § 2 violation by use of the city's current electoral system to effectively bring to a halt minority vote dilution in city at-large elections.  Briefs in support of any suggested remedy shall be filed concurrently with the proposed decree.

A hearing on the proposed remedies shall be held on Monday, June 19, 1995, at 9:30 a.m., in Courtroom No. 2 of the Federal Building, at which time the parties and other interested voters may be heard on the appropriate remedy.  Any registered Memphis voters, other than a party, desiring to be heard on prospective remedies shall file with the Clerk of Court, on or before Thursday, June 15, 1995, an identification of the person requesting to be heard with an address and phone number, and a statement of arguments.

IT IS SO ORDERED this 25th day of April, 1995.

JEROME TURNER
UNITED STATES DISTRICT JUDGE

27